UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
UNITED STATES OF AMERICA

        - v -

                                 15 CR 125 (PKC)

**GABRIEL AGUIRRE CUERO,**
     Defendant.
------------------------------------X


# SENTENCING MEMORANDUM
# ON BEHALF OF GABRIEL AGUIRRE CUERO


                                 DAVID PATTON, ESQ.
                                 Federal Defenders of New York
                                 Attorney for Defendant
                                 **Gabriel Aguirre Cuero**
                                 52 Duane Street, 10th Floor
                                 New York, NY 10007
                                 Tel.: (212) 417-8728
                                 **Amy Gallicchio**, Esq.
                                 Of Counsel




TO:        PREET BHARARA, ESQ.
            United States Attorney
            Southern District of New York
            1 St. Andrew's Plaza
            New York, NY 10007

Attn:     Emil Bove, Esq.
            Assistant United States Attorney

**Federal Defenders**
OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director*

*Southern District of New York*
Jennifer L. Brown
*Attorney-in-Charge*

January 6, 2017

**BY ECF AND HAND DELIVERY**

Honorable P. Kevin Castel
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

    Re:    **United States v. Gabriel Aguirre Cuero**
            **15 Cr. 125 (PKC)**

Dear Judge Castel:

    One can only imagine how desperate a man must be to risk losing his life and liberty in an effort to feed his family. When Mr. Aguirre Cuero returned to Colombia following his release from prison in 2012, there was no work for a fisherman. After three years of unsuccessfully searching for a job, the debt was overwhelming and his family was in financial crisis. The offer of $5,000 up front and another $5,000 upon delivery was an inducement he could not resist at a time when his family was going to bed hungry. It was in a state of desperation and hopelessness that Mr. Aguirre Cuero again boarded a go-fast boat and agreed to transport cocaine over the waters off the coast of Colombia.

    For this act of desperation, Mr. Aguirre Cuero has already been punished harshly and scared permanently. Following his arrest and while awaiting extradition, Mr. Aguirre Cuero spent 14 months in Colombian prisons under deplorable and inhumane conditions. While at La Picota prison in Bogotá, he suffered a fall which left him with a broken and permanently disfigured wrist, having received little to no medical attention. As a result, he has permanent weakness in his right hand and constant pain. He is now in an American jail, 2,500 miles away from his loved ones with no hope of seeing them until his release and return to Colombia.

    The advisory guideline range of 151 to 188 months incarceration is an absurdly harsh result as applied to Mr. Aguirre Cuero. The advisory guidelines, which are driven nearly exclusively by the weight of the drugs recovered from the boat, fails to account for the nature and circumstances of Mr. Aguirre Cuero's offense or his history and characteristics. He, a poor fisherman-courier, is the smallest player in the drug world, exploited by those in charge, and

placed in the greatest danger because he is poor and powerless. And yet, the guidelines recommend treating Mr. Aguirre Cuero with the same term of imprisonment as they would for the wealthy kingpin who owned the drugs on this boat and many others like it. This case is the quintessential example of where the guidelines "have run amok that they are patently absurd on their face." United States v. Adelson, 441 F.Supp.2d 506, 515 (S.D.N.Y. 2006), *aff'd mem.*, 301 Fed. Appx. 93 (2d Cir. 2008).

Mr. Aguirre Cuero is facing a mandatory minimum sentence of five years' incarceration following his guilty plea to violating the Maritime Drug Law Enforcement Act and we are asking the Court to impose a sentence of five years. Mr. Aguirre Cuero's life of great poverty, the absence of any meaningful or influential association with drug organizations[1], his extremely harsh conditions of incarceration in Colombia and resultant permanent disfigurement, and his detention 2,500 miles from his loved ones all support a sentence of five years. Such a sentence, under all the circumstances, is "sufficient but not greater than necessary" to serve the purposes of sentencing as set out in 18 U.S.C. ¶ 3553(a)(2).

## BACKGROUND

Buenaventura, Colombia is where Mr. Aguirre Cuero calls home and where he raised his children. To say that it is a tough place to live does not come close to doing it justice. On March 20, 2014, Human Rights Watch published a report entitled "The Crisis in Buenaventura, Disappearances, Dismemberments, and Displacement in Colombia's Main Pacific Port." *Available at https://www.hrw.org/report/2014/03/20/crisis-buenaventura/disappearances-dismemberment-and-displacement-colombias-main.* The study, focusing primarily on the epidemic of extreme violence and horrific cruelties by left-wing guerillas and paramilitary groups, found "exceptionally high levels of poverty and unemployment in Buenaventura. According to the latest available government statistics (from 2003), more than 80 percent of Buenaventura's population lived in poverty. In 2011, the unemployment rate in Buenaventura was reportedly 40 percent, roughly four times the national rate." Id. The Americas director at Human Rights Watch, Jose Miguel Vivanco, called the situation in Buenaventura "among the very worst we've seen in many years of working in Colombia and the region. Simply walking on the wrong street can get you abducted and dismembered, so it's no surprise the residents are fleeing by the thousands." *Available at http://www.economist.com/blogs/americasview/2014/03/colombias-most-violent-city.*

---

[1] Probation Officer Velez-Garcia reports in the PSR that the DEA investigation revealed that Mr. Aguirre Cuero was a member of a Colombian-based drug trafficking organization. It is important to note that the period of his "membership" is reported as one month leading up to and including his arrest. He is not alleged to have any leadership role in the organization; was not observed at and did not participated in the laboratory producing cocaine; and was not the target of any intercepted communications. His participation is limited to being part of the three man crew operating the go-fast boat. PSR ¶14 and p15.

Mr. Aguirre Cuero has done his very best to keep his family alive and safe in a very difficult environment and under very difficult circumstances. It has been an endless struggle to provide for his family and make ends meet financially. He is in constant fear for their safety and now powerless to protect them. As he writes in his letter to the Court, "I feel very ashamed of what I did, I feel horrible for what is happening to my family." He knows that his "choice" placed his family in an "even worse situation". See Gabriel Aguirre Cuero letter attached as **Exhibit A.**

Mr. Aguirre Cuero comes from very humble beginnings. He grew up in a fishing village in the coastal state of Nariño, Colombia. The coastal state is isolated by jungle and waterways and is one of the most inaccessible areas of the country. His childhood home had no walls, no electricity, and very little furniture. Mr. Aguirre Cuero recalls the family sleeping in one room on mats on the floor. His mother and father were a loving couple and devoted parents but life was very hard. His father was a farmer and woodcutter and often gone for weeks at a time working at a cattle farm or cutting trees in the mountains. Food was scarce and at age 10, in order to help feed the family, Mr. Aguirre Cuero went to work fishing. He didn't start school until he was 12 years old, but continued to work on fishing boats at night, selling his catch in the morning before going to class.

In December of 1979, when Mr. Aguirre Cuero was 16 years old, tragedy struck. A major earthquake measuring 7.9 on the Richter scale occurred along the Pacific Coast of Colombia and, with the tsunami that followed, it wiped out Mr. Aguirre Cuero's village and many others in Nariño. His family lost what little they had but their lives were spared. They were forced to leave the coastal area and relocated inland to a mountainous region where he joined his father to work in the logging business, cutting trees for lumber and transporting it down the mountain. The work was physical and grueling. His legs carry the scars of accidents from wielding an ax for five arduous years. At 16, Mr. Aguirre Cuero was forced to end his short lived education and work full time. He continued this line of work until he was 21 years old when he moved to Buenaventura and returned to fishing.

Life as a commercial fisherman in the 1980's and 1990's in Buenaventura was difficult but he made enough to survive. He moved his parents from the mountains to the city so he could care for them and when he was 28 years old, he fell in love and got married. He and his wife, Esequiela Hernandez, had three children. Mr. Aguirre Cuero made enough money to pay his bills and feed, clothe and educate his children.

Times started to get tough in the early part of 2000. Mr. Aguirre Cuero worked on large commercial shrimping boats and when the catch dried up, he began to work on shark fishing boats. Unlike shrimping, shark fishing was only seasonal and the income was never enough to make ends meet. Even when the fish were plentiful, he would only take home $125-$175 a month and when the fish were scarce, $25- $50 a month. He couldn't pay his bills and more importantly, couldn't afford the monthly tuition for his daughter's school or the transportation cost to even send her to school.

Not surprisingly, many of the large commercial fishing vessels docked in Buenaventura were owned by the drug cartels who had at their disposal crews of vulnerable and struggling fisherman like Mr. Aguirre Cuero. Vessels out on legitimate fishing trips were often ordered to change course to accept a shipment of cocaine or to refuel a boat. There was no choice but to comply. Mr. Aguirre Cuero found himself in that very predicament on several occasions. And in 2007, he was offered what was a fortune to him, to captain a go-fast boat laden with cocaine. The boat was intercepted on international waters and he was arrested and extradited to the United States. ██████████████████████████████████████████████████████████

Mr. Aguirre Cuero returned to Buenaventura in 2012.

## OFFENSE CONDUCT

Life was very hard upon his return to Buenaventura. Because of the connection to the drug cartels, the Colombian government effectively shut down the fishing industry leaving most men in Mr. Aguirre Cuero's community jobless. For three years, Mr. Aguirre Cuero struggled to find work which he would come upon only on occasion. He was surviving on the generosity and loans of friends and family but that generosity eventually dried up and he was once again destitute and in mounting debt. The electricity to the house was cut off and, soon thereafter, so was the water. Mr. Aguirre Cuero and his family were left to carry water from a neighbor's house to drink, cook and bathe. His daughter, Erika, missed a year of school because there wasn't enough money to pay her tuition and transportation costs. It was more than a husband and father could bear. His neighbor and friend, Olga Vastos, put it best in her letter to the Court, "sometimes the lack of work is too much, you lose hope, and for your children to say to a father I'm hungry and there's no money, it's hard, there are so many things, Your Honor, no one really knows another person's situation." See Olga Vastos letter attached as **Exhibit B.**

Desperate and hopeless, he made the fateful choice to again risk life and liberty to feed his family. With an offer of $5000 up front and a promise of $5000 upon delivery, he was powerless to refuse. He knows how wrong his choice was and how grave his situation is. He understands that the Court will be rightfully troubled by the fact that he was arrested and incarcerated in 2007 for the same type of offense. He expects to be punished but hopes Your Honor will understand the desperate nature of his actions. In asking for forgiveness and promising not to reoffend, he tells the Court, "I know if I ever do anything like this again, I will never get out of prison, I will receive a life sentence. It pains me greatly to even think of that possibility, the chance I may never see my family again ever." See **Exhibit A**.

### A. COLOMBIAN PRISON CONDITIONS

Prior to his arrival in the United States on April 27, 2016, Mr. Aguirre Cuero was jailed awaiting extradition first for six months in a Buenaventura jail and then eight months in La Picota prison in Bogota, Colombia. At La Picota, he was held in the maximum security area of the prison, known as the Eron towers, designated for both those awaiting extradition and those

4

considered the most dangerous and violent offenders. The conditions were deplorable and inhumane.

On October 28, 2015, a letter on behalf of the 150 plus detainees awaiting extradition at La Picota Eron towers was prepared in the hope of having their concerns and grievances heard. See Letter "From 'La Picota', Awaiting Extradition", attached as **Exhibit C** (with translation.)[2] The letter outlines the unacceptable and appalling conditions faced by Mr. Aguirre Cuero and the other detainees awaiting extradition. The letter chronicles the lack of sunlight, heat, electricity, and running water. The resultant skin conditions, infections, stomach disorders, and respiratory problems are just the tip of the iceberg. These problems are compounded by the lack of medical care. As the letter notes in concern number 12, there is only one primary doctor available only a few days a week to serve an inmate population of nearly 3,000 in the Eron towers. Id. As the writer reports, "One of the prisoners on our patio was recently diagnosed with tuberculosis, and at the time of writing this letter there has been no effort by the prison administration to conduct any TB tests, putting us and our families/visitors at risk." Id. paragraph 12.

On December 10, 2015, Radio Santa Fe in Bogotá, reported that after inspection of conditions at La Picota, the Ombudsman's Office warned about the improper handling of food at the prison. "According to the Ombudsman's Office, the food, which is poured into 40-liter jars, must be carried from the second to the eighth floor, where the pavilions are, and as the elevator does not work the prisoners must do a whole series of maneuvers to lift the heavy liquid. In the route the food spills and is exposed to all kinds of bacteria. Finally, when it reaches its destination, more than half of the soup has been scattered along the way. Likewise, he also denounced that the juice that the inmates will consume is rendered with water from the showers. Finally, the Office of the Ombudsman found several prisoners sick in jail, who assert that their ills are due to the lack of hygiene with which the food is transported." *Available at http://www.radiosantafe.com/2015/12/10/defensoria-denuncia-inadecuada-manipulacion-de-alimentos-en-carcel-la-picota/*

Of particular relevance to Mr. Aguirre Cuero is the practice, described in both the Radio Santa Fe piece and concern number 10 of the prisoner's letter (see **Exhibit C**), of inmates hauling food in enormous containers up and down nine floors to feed their unit. While assigned that task in September 2015, Mr. Aguirre Cuero slipped and fell down a flight of stairs fracturing his right wrist. He was taken to the prison hospital but since there was no doctor on duty, he was turned away without treatment. A fellow inmate who was a medical doctor attempted to manually realign his wrist and set it with a homemade splint. Mr. Aguirre Cuero received no additional medical treatment from the Colombian prison authorities who claimed that since he was officially in United States custody, they had no obligation to treat him. In May of 2016, while at the MCC, an X-ray was taken of his wrist and the radiology report notes an "old healed fracture deformity of the distal radius at the distal metaphysis level". See Radiology Report attached as **Exhibit D.** It is too late for medical or surgical intervention.

---

[2] The letter attached as Exhibit C was photographed and emailed to defense counsel resulting in the darker resolution.

The types of conditions faced by Mr. Aguirre Cuero and others at La Picota prison were also documented in an article written by Jim Wyss, the Andean bureau chief at the Miami Herald, published on November 24, 2015 and entitled "*Hard times: U.S. Extradition System Strands Detainees Abroad*". *Available at http://www.miamiherald.com/news/nation-world/world/americas/article46351585.html.* Mr. Wyss reports "Colombian court documents paint an ugly picture of the two pavilions where the 'extraditables' are held. After an inspection in 2013, the court found the wards had poor ventilation and drainage, and only sporadic running water. They acknowledged that the absolute lack of sunlight was a violation of Colombian human rights…Inmates described toilets clogged with feces due to lack of water and having to go days without showers. One former prisoner said the cells smelled so bad he resorted to smearing deodorant on the walls. The little water that is available isn't potable, so inmates have to line up, sometimes for hours, to boil it just for a drink." *Id.*

In addition to experiencing permanent wrist deformity and pain, Mr. Aguirre Cuero also suffers from high cholesterol, a history of latent TB infection, and cataracts. Incarceration for this 53 year old man has already been considerably debilitating.

## THE APPROPRIATE SENTENCE

### A. ARGUMENT

For his conduct, five years' incarceration is punishment enough particularly in light of the brutal and inhumane conditions of incarceration he has already endured while awaiting extradition to the United States. Although the guidelines recommend imprisoning him for well over a decade, such a result is absurd and unnecessary. While the Court must calculate the applicable Sentencing Guidelines range, "[t]he Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable." Nelson v. United States, 555 U.S. 350, 352 (2009).

The overarching command of Section 3553(a) is that sentences should be sufficient, but not greater than necessary" to achieve the basic goals of retribution, deterrence and rehabilitation. 18 U.S.C. ¶ 3353(a)(2). Here especially, the ¶ 3353(a) factors must be carefully considered when imposing sentence. "[T]he Sentencing Guidelines, because of their arithmetic approach and also in an effort to appear 'objective', tend to place great weight on putatively measurable quantities, such as the weight of drugs in narcotics cases or the amount of financial loss in fraud cases, without, however, explaining why it is appropriate to accord such huge weight to such factors." Adelson, 441 F. Supp. 2d at 509 (citing Kate Stith & José A. Cabranes, *Fear of Judging: Sentencing Guidelines in the Federal Courts* 69 (1998)). In Adelson, Judge Rakoff wisely commented "Where the Sentencing Guidelines provide reasonable guidance, they are of considerable help to any judge in fashioning a sentence that is fair, just, and reasonable. But where, as here, the calculations under the guidelines have so run amok that they are patently absurd on their face, a Court is forced to place greater reliance on the more general

6

considerations set forth in section 3553(a), as carefully applied to the particular circumstances of the case and of the human being who will bear the consequences." Id., at 515.

### B. NATURE AND CIRCUMSTANCES OF THE OFFENSE AND HISTORY AND CHARACTERISTICS OF MR. AGUIRRE CUERO

Here, the human being who bears the consequences is a humble man so devoted to his family that their suffering lead him to again risk life and liberty in an effort provide them the basics necessities to survive. Simply put, his crime is borne out of poverty and privation.

Mr. Aguirre Cuero is by all accounts a good and decent man. He is a quiet, peaceful, and religious man. He is adored by his family and missed terribly. The letters from his friends and family and selected excerpts below describe his character best:

- *Olga Vastos* (neighbor): When he would come back from a fishing trip, he would always share his catch with the neighbors, and when he started to have children, Your Honor, he was even more devoted to them, always wanting to give them the best, a good education, teaching them respect, to be good people, etc. I know him well, as a courteous, respectful and charming person. See **Exhibit B.**

- *Kelly Tatiana Aguirre Hernandez* (daughter): Your Honor, I have known Mr. Gabriel Aguirre for 23 years because he is my father. Mr. Gabriel Aguirre is very devoted to his family, he is honorable, friendly and attentive. My parents are so beautiful, the most beloved people in my life. Your Honor, my father is a humble man, he is always looking out for his loved ones, he cares for all of them. Ever since I was a young girl, he always indulged me and my siblings, he has wanted the best for us as his family, he is someone who fights every day to be able to provide a better future to his family. My father is the best thing that has ever happened to me, he is the best father in the world. See letter from Kelly Tatiana Aguirre Hernandez attached as **Exhibit E.**

- *Erika Gabriel Aguirre Hernandez* (daughter): My father displayed his generosity in a unique way, helping people who really needed it. I have learned many things from him, such as learning to share. He is a very charitable man, whoever needs him, he will be there, Your Honor. His love for his family is unique. He has always been a good father and a spectacular husband. I remember when I was young, we would always go walking downtown, we spent a lot of time together as a family, but we can't do that now, because he

is not here. I miss my father so much, the emptiness I feel is enormous, and though we do talk, it is not the same as having him here. See letter from Erika Gabriel Aguirre Hernandez attached as **Exhibit F.**

- *Jarol Portocarrero Aguirre* (nephew): As an uncle, he was like a second father to me, he indulged me, gave me advice, and supported me so that my dreams would come true... He was someone who supported me to continue my education and when I wanted to give up, he would always encourage me to carry on. Even when he had his own family, he was always there; he is known as a spontaneous and cheerful person. See letter from Jarol Portocarrero Aguirre attached as **Exhibit G.**

- *Wilber Arley Portocarrero Aguirre* (nephew): Mr. Gabriel Aguirre saw my birth, he is my uncle, the brother of my mother, and he was always with us, helping us in whatever way he could. He is someone who has been responsible and respectful to the entire family and his co-workers; whenever I needed a favor, he would help me and was always willing to help anyone who needed a favor. See letter from Arley Portocarrero Aguirre attached as **Exhibit H.**

- *Dominga Aguirre* (sister): Mr. Gabriel Aguirre is a very honest, respectful, serious and honest man. He cared for me when I was sick and he would feed me, I couldn't even pick up a spoon, I couldn't do it for myself, Mr. Gabriel Aguirre would do it for me, he would take me to the doctor and he had to carry me, Your Honor. I am someone who cannot walk. He would give offerings in his religious activity, he took in his parents and cared for them, they were ill and had no one to take care of them. See letter from Dominga Aguirre attached as **Exhibit I.**

### C. DETERRENCE AND SENTENCE PARITY

The Court must determine what sentence is sufficient but not greater than necessary to generally deter others in the community. Here the community is thousands of miles away in South America and suffering from extreme poverty. Under these circumstances, the goal of general deterrence is far harder to achieve, no matter what the length of sentence imposed. Fisherman and others who agree to act as couriers are driven by a financial desperation so great that the very real risk of dying at sea often does not deter them. Fourteen months of incarceration under inhumane conditions and a sentence of five years in prison far away from family is sufficient to achieve this difficult goal of general and specific deterrence. Anything more is unnecessary and ineffective.

In imposing sentence, the Court must attempt to preserve sentence parity between similarly situated defendants. Recognizing the relatively minor role of drug couriers and the often sympathetic and financially desperate motivations for their involvement, courts routinely impose what can be characterized as relatively lenient sentences on drug couriers. A recent review of sentences imposed in the last three years in the Southern District of New York did not reveal even a single sentence approaching the guideline range calculated in those cases or here.

### D. RESPECT FOR THE LAW AND PUNISHMENT

Mr. Aguirre Cuero has already paid a hefty price and suffered greatly because of his actions. He has certainly been punished in a way that our system of criminal justice would ever tolerate. Before arriving in the United States, he was held in deplorable and inhumane conditions and is physically scarred for life as a result. He is now thousands of miles away from his beloved family and helpless to provide for and protect them. Furthermore, he will spend whatever period of incarceration the Court imposes without a single visitor and with limited financial ability to even speak with his loved ones. Following the completion of his sentence, he will undoubtedly be held in jail longer in an immigration facility awaiting deportation. For Mr. Aguirre Cuero and his offense, five years in jail in the U.S. are sufficient to meet the overarching command of Section 3553(a).

### E. CREDIT FOR TIME SERVED IN COLOMBIA

In August 2016, the Court received and docketed a letter from the Consulate Office of Colombia on behalf of the Ministry of Foreign Affairs of Colombia. (**Letter from the Consular Office of Colombia, ECF No. 13.**) Attached to the letter is Diplomatic Note 0430 dated March 10, 2016, containing assurances made by the Government of the United States to the Government of Colombia regarding the extradition of Mr. Aguirre Cuero and Resolution 296 dated December 23, 2015, containing the decision by the Ministry of the Interior and Justice of Colombia on the request for extradition. One of the conditions behind the Colombian decision to approve extradition was "that the time that he has been spent in detention by virtue of the these [sic] proceedings should be taken as part of the penalty which may eventually be imposed upon him in the State Requiring." Id. at 14.

Mr. Aguirre Cuero is also in receipt of a letter (cc'd to defense counsel) from the Consulate of Colombia in New York with an attached letter from the Ministry of Foreign Affairs-Office of International Legal Affairs to the Embassy of the United States containing a certificate of time served while custody in Colombia. See Letter and Certificate from the Ministry of Foreign Affairs attached collectively as **Exhibit J**. The certificate informs the following: "GABRIEL AGUIRRE CUERO remained in custody, between July 9, 2015 (date he was captured with extradition purpose) and April 17, 2016, (date custody was transferred to the authorities of the United States of America." Id. The Ministry of Foreign Affairs requests that the period of time he was deprived of liberty in Colombia be taken into account in the United States. Id.

Mr. Aguirre Cuero is not only entitled to the time credit reflected in this certificate but also to credit for the time served from his arrest on February 18, 2016. We ask the Court order that he be so credited.

## CONCLUSION

For all the above stated reasons, I ask that the Court impose a sentence of five years.

Respectfully submitted,

Amy Gallicchio, Esq.
Assistant Federal Defender
Federal Defenders of New York
(212) 417-8728

Cc: AUSA Emil Bove