K9f1agua

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

            v.                          15 Cr. 125 (PKC)

GABRIEL AGUIRRE CUERO,

            Defendant.                  Bail Argument
                                        (Via Teleconference)
------------------------------x
                                        New York, N.Y.
                                        September 15, 2020
                                        11:04 a.m.

Before:

               HON. P. KEVIN CASTEL,

                                        District Judge

                    APPEARANCES

AUDREY STRAUSS
     Acting United States Attorney for the
     Southern District of New York
BY:  EMIL J. BOVE III
     Assistant United States Attorney

FEDERAL DEFENDERS OF NEW YORK INC.
     Attorneys for Defendant
BY:  AMY GALLICCHIO, ESQ.
```

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

```
1                  (Case called)
2            THE COURT:  The appearance for the government?
3            MR. BOVE:  Emil Bove for the government.
4            THE COURT:  Thank you, Mr. Bove.
5            And for the defendant.
6            MS. GALLICCHIO:  The Federal Defenders, by Amy
7    Gallicchio.
8            THE COURT:  Thank you, Ms. Gallicchio.
9            Ms. Gallicchio, I understand your client, Mr. Cuero,
10   waives his appearance in this proceeding today, is that
11   correct?
12           MS. GALLICCHIO:  Yes, your Honor, that's correct.
13           THE COURT:  All right.  Thank you.
14           I have, of course, read the written submissions of the
15   parties, and I'll give Ms. Gallicchio an opportunity to
16   highlight that which she would like to highlight from her
17   motion papers.
18           MS. GALLICCHIO:  Thank you, your Honor.
19           I am asking the Court to grant compassionate release
20   based on, as I pointed out, the existence of extraordinary and
21   compelling reasons and after consideration of 3553(a) factors.
22   I will highlight, your Honor, that it is our position, my
23   position, that extraordinary and compelling reasons do exist by
24   virtue of my client's age and his medical condition, that being
25   that he suffers with hypertension.  I think there can be no
```

Case 1:15-cr-00125-PKC Document 196-5 Filed 03/22/22 Page 3 of 13    3
Case 1:15-cr-00125-PKC Document 96-5 Filed 08/22/22 Page 3 of 13
K9f1agua

doubt that hypertension is a dangerous condition under normal circumstances, and certainly can be deadly in conjunction with COVID-19. And as I pointed out in my letter, certainly the scientific and medical literature has linked hypertension with a substantial increase in a risk of dying and the highest risk of hospitalization. So your Honor, it would be our position that that combination of conditions certainly does establish extraordinary and compelling reasons.

And certainly as the Court is well aware, jails are dangerous places for the spread of COVID-19. Great Plains, where Mr. Cuero is currently incarcerated, has had 115 cases of coronavirus, of COVID-19, confirmed cases. Of those 115, according to the BOP website this morning, there have been 111 recovered; there has been one death, sadly; and there are still three positive cases as of this morning.

I would also like to point out something that I don't think I addressed in my letter, but in response to the government's letter, suggesting that Mr. Cuero would be safer from COVID-19 in his jail in Oklahoma than in his hometown of Buena Ventura in Colombia, but I think, your Honor, if you look at the numbers, that argument, that suggestion, is certainly belied by the statistics. Just looking this morning at the COVID numbers on the New York Times COVID map, it appears that numbers in Oklahoma have been on the rise. In fact, Oklahoma is on the New York State travel advisory and quarantine list

|    |                                                                                     |
|----|-------------------------------------------------------------------------------------|
| 1  | for travelers coming into New York.  Your Honor, Oklahoma state                     |
| 2  | has a population of 4 million people, and as of today, as                           |
| 3  | reported in the New York Times, there are today recorded 869                        |
| 4  | new cases, which is an increase of 15 percent over the last two                     |
| 5  | weeks.  And I want to compare that to the district, or the                          |
| 6  | department in which Mr. Cuero lives, which can be I think the                       |
| 7  | equivalent of a state, really.  And as of today's numbers,                          |
| 8  | there are -- that is a location of 4½ million people, so bigger                     |
| 9  | than Oklahoma state, and the new numbers there are 393, much                        |
| 10 | less than the 869 in Oklahoma state.  And that is a decrease                        |
| 11 | from the numbers as reported in the government's letter in                          |
| 12 | their exhibit, Exhibit D.                                                           |
| 13 |     Also, I'd like to point out, your Honor, that in the        |
| 14 | county in which Mr. Cuero is incarcerated, Caddo, C-A-D-D-O,                        |
| 15 | County, in the last seven days, there have been 48 new cases                        |
| 16 | reported, in a town of 30,000 people.  In Mr. Cuero's town of                       |
| 17 | Buena Ventura, a town of 333,000 people, 10 times bigger than                       |
| 18 | the county in which he is incarcerated, they reported as of                         |
| 19 | this morning, when I checked the website that the government                        |
| 20 | had provided in their documentation, Exhibit D, there's only                        |
| 21 | one new reported case.  So I think that if it is a                                  |
| 22 | consideration for the Court, then I think the numbers speak for                     |
| 23 | themselves.                                                                         |
| 24 |     I'd also, your Honor, just like to correct or point         |
| 25 | out what I believe is an error in the government's                                  |

1    representation in their letter.  On page 6, where the
2    government reports that all of the ICU beds in the department
3    in Colombia were filled, I think that that's a misreading of
4    government's own interpretation, which is reported on page 10
5    of Exhibit D, which does appear to indicate that there were
6    actually 246 beds available.  And as of today, there are
7    actually more, according to the same website that the
8    government provided.  So again, your Honor, to the extent that
9    is a consideration, I think that the numbers in Colombia are
10   certainly a lot better than they are in a lot of places and
11   certainly a lot better than they are in Oklahoma, where my
12   client is incarcerated.
13            Your Honor, I'd like to move on to touch on the next
14   consideration for the Court, should the Court find
15   extraordinary and compelling reasons, and that would be
16   consideration of 3553(a) factors.  The Court is well aware of
17   Mr. Cuero's history and characteristics through the many
18   proceedings we've had, sentencing submissions, and so I'm not
19   going to revisit the past.  I would like to point out that new
20   information is relevant and the Court should consider
21   Mr. Cuero's comportment since his period of incarceration, and
22   also his efforts to improve himself, by programming, extensive
23   programming, until, of course, COVID-19 arrived and all
24   programming has stopped in his facility.  And so I think that
25   now certainly the Court -- none of us could have anticipated

the degree to which the conditions of confinement would change at the time of Mr. Cuero's sentencing. Never in our wildest imaginations could we imagine what we're going through right now. And certainly as a result, Mr. Cuero's level of punishment has increased dramatically from what I'm sure the Court likely expected when imposing sentence. And your Honor is well aware of the conditions of confinement, I'm sure, throughout the country, having I'm sure addressed many of these motions for compassionate release. And the Bureau of Prisons is in a lockdown, they've been in a lockdown since March, and we can't underestimate -- I ask the Court not to underestimate the trauma of a lockdown for months on end. To be locked in a cell for 23 to 24 hours a day is dehumanizing and demoralizing and debilitating, and it's an extreme form of punishment ordinarily reserved for the most dangerous and violent prisoners. And this is certainly not the type of punishment that I imagine the Court would have envisioned when imposing the sentence.

And certainly now, and probably for the foreseeable future, there will be no ability for Mr. Cuero to continue his programming, which would certainly help to reduce the length of his sentence by participating in programs.

Your Honor, Mr. Cuero has -- the time that he has already served has been difficult. The Court is well aware of the time he spent in Colombia and the difficult conditions that

K9f1agua

1  he encountered there.  Before the pandemic, he was at the MCC,
2  and the Court is well aware of the conditions prepandemic at
3  the MCC, and then of course during the pandemic he has been
4  subjected to extreme conditions of punishment.
5        So we would ask your Honor to consider that the time
6  already served has certainly reflected the seriousness of the
7  crime, has most certainly deterred him and anyone who's been
8  paying attention, and protected the public, but it has not
9  provided him with what we had all hoped he would get, not to
10 the extent we hoped he would get it -- education, vocation, and
11 certainly not the medical care in the most effective manner, as
12 contemplated by 3553(a).  And therefore, your Honor, I submit
13 that there is no longer a need for the sentence that was
14 originally imposed, and we ask your Honor to grant our
15 petition.
16        THE COURT:  Okay.  Thank you, Ms. Gallicchio.
17        Mr. Bove?
18        MR. BOVE:  Thank you, Judge.
19        Your Honor, I don't want to do anything in responding
20 to this motion to suggest that I'm ignoring or seeking to
21 minimize the seriousness of the pandemic generally or the
22 situation that the defendant in this case faces, but the fact
23 of the matter is that there is a statute to apply and guidance
24 from the Sentencing Commission about when compassionate release
25 is appropriate, and the defendant has not met those standards.

1     We cite a case from Judge Kaplan in our submission,
2     *Serrano*, S-E-R-R-A-N-O, in which he found, in I think a
3     persuasive opinion, that a defendant of very similar age and
4     health conditions did not meet the standard for extraordinary
5     and compelling reasons under Section 3582.
6     And I think that the independent basis for denying
7     this motion is the balancing of the 3553(a) factors. I
8     discussed those in the opposition that's before the Court, and
9     I don't want to belabor those points, but I think particularly
10    pertinent here is your Honor's finding at the sentencing in
11    this case that there was still a need for specific deterrence
12    of this defendant in light of his recidivism and in light of
13    the skills that he has obtained and used as a drug trafficker.
14    And so for I guess either or both of those reasons,
15    this is a motion that should be denied.
16    And I think that the motion is, to some extent, maybe
17    not academic, but there's a tension in it because of the
18    consecutive sentence that the defendant faces in the Middle
19    District of Florida that he will also have to complete absent
20    some sort of compassionate release relief in that case.
21    And so for all of these reasons, Judge, we think the
22    motion should be denied.
23    THE COURT: Thank you, Mr. Bove.
24    Ms. Gallicchio, if you'd like to reply, you may.
25    MS. GALLICCHIO: Your Honor, just briefly.

1    I do recognize the complications of the consecutive
2    sentence in Florida.  And I have been in contact with
3    Mr. Cuero's attorneys in Florida, and obviously someone has to
4    go first, and so we thought it made sense for me to make the
5    application first.  I don't think the existence of the
6    consecutive sentence, just like the existence of an immigration
7    detainer, precludes the Court from making a determination in
8    this case, and if Mr. Cuero is successful before your Honor, he
9    will certainly make a similar application in Florida.
10    THE COURT:  Thank you.
11    MS. GALLICCHIO:  You're welcome.
12    THE COURT:  This is the Court's statement of reasons
13    for its decision on Mr. Cuero's application.
14    I've considered the thoughtful written submissions and
15    excellent arguments presented by counsel on both sides.
16    Section 3582(c)(1)(A) of Title 18 permits a defendant, after
17    fully exhausting all administrative rights before the BOP, to
18    bring a motion for a sentence reduction based on extraordinary
19    and compelling circumstances.  Here, the defendant has asserted
20    that he has satisfied the statutory exhaustion requirements,
21    and no argument is advanced by the government that he has not.
22    I conclude that he has satisfied the exhaustion requirement.
23    So I proceed to consider the application.
24    The United States Sentencing Commission was required
25    by statute to promulgate general policy statements regarding

the sentencing modification provisions in 3582(c)(1)(A) and describing what should be considered as extraordinary and compelling reasons. I've considered the commission's policy statements in making my decision.

I've also considered each of the 3553(a) factors. And the reality here is that the defendant, who had been previously convicted of a drug trafficking crime and who had engaged in, and admitted, when he was a cooperator for the government in the first case brought against him, that he had engaged in numerous, 15 or so, drug smuggling operations, and in fact in the case in which he was a cooperator, it involved a 2.8-ton cocaine shipment. The defendant was facing a guideline range before me of 168 to 210 months' imprisonment, and the Court gave the defendant a substantial variance. It did so taking into account the conditions in which he was held here and in Colombia, the length of time he was held in Colombia, and his medical conditions, among other things, and fashioned a sentence of principally 144 months' imprisonment.

The defendant received a sentence consecutive to that on his violation of the terms of supervised release in the Middle District of Florida, and in that case, Judge Lazzara, in 2018, early 2018, gave the defendant a consecutive sentence of 30 months' imprisonment.

At present time, the defendant has served about 39 percent of the combined sentence and is scheduled for a

release date on June 27, 2027. Counsel for Mr. Cuero is quite correct that my concern on this application is only whether the sentence of 144 months that I imposed ought to be reduced.

Now the Court acknowledges that the rates of infection with COVID-19 in Caddo, Oklahoma, where Great Plains Correctional is located, appears to be higher than it is in Buena Ventura, Colombia, the town that Mr. Cuero is from. There is, of course, an immigration detainer upon any sentence reduction by me. He would still face the sentence by Judge Lazzara, and upon completion of that, he would face an immigration detainer. None of which disqualifies him from consideration under the statute.

The Court accepts the proposition that he has hypertension and that he is also 57 years of age. His weight seems to be good. The medical records I saw in terms of his oxygen saturation appear to be good. And he is taking medication for his hypertension.

The Court recognizes that a person who is incarcerated has less of an ability to engage in social distancing, utilize PPE and sanitizers at will, and therefore doesn't have the freedom that one might have if you were at liberty to, say, totally isolate and decide that you didn't want to go out of your house or meet with anyone. The deprivation of liberty necessitated by incarceration deprives a person of that.

Also, the Court recognizes that a person who is

|     |                                                                        |
| --- | ---------------------------------------------------------------------- |
| 1   | incarcerated who contracts COVID-19 has fewer options.  They           |
| 2   | can't go to the doctor of their choice, the hospital of their          |
| 3   | choice; their medical care is at the direction of the Bureau of        |
| 4   | Prisons authorities.  So the Court accepts that as a premise,          |
| 5   | accepts that hypertension increases the risk that contracting          |
| 6   | COVID-19 could present a more serious situation, and certainly         |
| 7   | adults who have been hospitalized with COVID-19 have reported          |
| 8   | hypertension as one of the co-morbidities.  Here, it does              |
| 9   | appear to me that Mr. Cuero's hypertension is being well               |
| 10  | attended to in the custody of the Bureau of Prisons, and that          |
| 11  | is what I would expect to happen, and that is a good thing that        |
| 12  | it is happening, and that the Bureau of Prisons, which has had         |
| 13  | problems, significant problems at Great Plains, appears to, at         |
| 14  | the moment, at least, have it under control.  And that is a            |
| 15  | good thing.  We're talking about something on the order of             |
| 16  | three active cases as of the moment.  That's not to say that           |
| 17  | that couldn't change tomorrow, and it certainly doesn't suggest        |
| 18  | that it wasn't higher at an earlier point in time.                     |
| 19  |      But taking into account the seriousness of Mr. Cuero's            |
| 20  | offense, the extreme, or I would say rather extreme downward           |
| 21  | variance that he received at the time of sentencing -- for good        |
| 22  | reason, downward variance that was appropriate -- and the              |
| 23  | amount of time that he has served just simply on the sentence          |
| 24  | before me, including the need for general deterrence and               |
| 25  | specific deterrence of this individual, who is not a one-off,          |

1    one-time sort of individual -- prior to 2007, he had engaged in
2    multiple importations, and of course had spent time in federal
3    custody, was charged with a federal crime, and that did not
4    deter him from reoffending.  Based on all the foregoing, the
5    Court concludes that there is not an extraordinary and
6    compelling reason to reduce the sentence of Gabriel Cuero, and
7    accordingly, the application is denied.
8             Is there anything further from the government?
9             MR. BOVE:  No, your Honor.  Thank you.
10            THE COURT:  Is there anything further from the
11   defendant?
12            MS. GALLICCHIO:  No, your Honor.  Nothing further.
13            THE COURT:  All right.  Thank you all very much.  We
14   are adjourned.
15                               o0o